| | | |
|---|---|---|
| Todd M. Mancini dba Mancini Electric | : | |
| | : | Chapter Thirteen |
| Debtor | : | Case No. 1-07-bk-02236 RNO |
| _____ | :_____ | |
| | : | |
| GMAC | : | |
| | : | |
| | : | |
| Objectant | : | |
| v. | : | {**Nature of Proceeding:** Objection to |
| | : | Chapter 13 Plan pursuant to |
| Todd M. Mancini dba Mancini Electric | : | § 1325(a)(9)(*)} |
| | : | |
| Respondent | : | |

# Opinion[1]

Pending before the Court is GMAC's Objection to the confirmation of Debtor, Todd M. Mancini dba Mancini Electric's, ("Debtor") chapter 13 plan. GMAC objects to the Debtor's attempt to cram down the value of a motor vehicle under 11 U.S.C. § 506(a)(1) and 11 U.S.C. § 1325(a)(5).[2] GMAC contends that the entire amount financed on the motor vehicle is a purchase money security interest granted within 910 days of the petition, and therefore, is protected from being crammed down by the "hanging paragraph" that was added to § 1325.[3] For the reasons stated herein, I find the negative equity on the trade-in vehicle and the gap insurance payment are not part of GMAC's purchase money security interest, and therefore, are not protected from cram down by the hanging paragraph of § 1325. The administrative fees, licensing fees and taxes are part of GMAC's purchase money security interest. I further will

---

[1]Drafted with the assistance of Jason Berger, Intern.

[2]Unless otherwise noted, all future statutory references are to the Bankruptcy Code, 11 U.S.C. § 101, et seq., as amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, 119 Stat. 37 ("BAPCPA").

[3]The hanging paragraph is referred to as such because it was added to the end of 11 U.S.C. § 1325(a)(9), but does not bear its own numbering. Further, the paragraph does not relate to § 1325(a)(9), but instead relates to § 1325(a)(5). For these reasons, courts refer to the paragraph as the "hanging paragraph" or "§ 1325(a)(*)". *See, e.g., In re Dunlap*, 383 B.R. 113, fn. 2 (Bankr. E.D.Wis. 2008). This Court will follow that convention.

-1-

employ the dual status rule to reduce the purchase money security interest by the amount of the negative equity and the gap insurance.

**Jurisdiction**

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core matter pursuant to 28 U.S.C. § 157(b)(2)(B), (K)  and (L).

**Facts**

The facts in this case are undisputed.[4]  On July 12, 2006, the Debtor purchased, for his personal use, a 2006 Chevrolet Avalanche Truck from Chevrolet of Hershey in Hershey, Pennsylvania.  In connection with the purchase, the Debtor traded in a 2004 Ford F-150 Truck. The trade-in was subject to a lien.  At the time he purchased the new vehicle, the Debtor owed $7,853.63 more on the trade-in vehicle than its value.  This amount is the negative equity on the trade-in.[5]  The Debtor paid the dealer a down payment of $2,000.00, which was applied against the negative equity owed on the traded-in vehicle.  The dealer agreed to finance the cash price of the new vehicle, the negative equity in the trade-in vehicle, gap insurance, administrative and licensing fees, and taxes.  The gap insurance financed was $450.00.  The total amount financed was $52,887.60.  As part of the transaction, the debt on the trade-in vehicle was paid off.  The Debtor signed a retail-installment contract in which he granted the dealer a security interest in the new vehicle.  The retail-installment contract disclosed the financing package total as the "Amount Financed", "Total of Payment", and "Total Sale Price" as mandated by the Federal Truth in Lending Act.  The dealer assigned the contract to GMAC, which perfected its security interest by having its name noted as "lienholder" on the Pennsylvania Certificate of Title.  The Debtor filed a chapter 13 bankruptcy on July 23, 2007, within 910 days after purchasing the new vehicle.  GMAC filed a proof of secured claim in the amount of $45,978.51.  GMAC's valuation of the Chevrolet as of the time of the filing of the petition was $29,250.00.[6]  The Debtor listed

---

[4]Unless otherwise noted, the parties stipulated to these facts in a document labeled "Stipulation of Facts" filed with the Court on May 23, 2008.

[5]Negative equity is the difference between the value of the trade-in and the amount owed to the lienholder on the trade-in.

[6]This valuation is not taken from the Stipulation of Facts, but is instead taken from "Objections of GMAC to Confirmation of Debtor's First Amended Chapter 13 Plan", p. 2, ¶2 (Docket.No. 39 Nov. 11, 2007).

-2-

the truck on his schedules as having a fair market value of $19,965.00. The Debtor proposed a chapter 13 plan, seeking to pay GMAC only the $19,965.00 that he had determined to be the fair market value of the truck, plus the contract rate of interest.[7]

**Analysis**

The hanging paragraph of § 1325 provides that:

> For purposes of paragraph (5), section 506 shall not apply to a claim described in that paragraph if the creditor has a purchase money security interest securing the debt that is the subject of the claim, the debt was incurred within the 910-day preceding the date of the filing of the petition, and the collateral for that debt consists of a motor vehicle (as defined in section 30102 of title 49) acquired for the personal use of the debtor, or if collateral for that debt consists of any other thing of value, if the debt was incurred during the 1-year period preceding that filing. §1325(a)(*).

It is undisputed that the debt was incurred within the 910 days preceding the date of the filing of the petition. It is also undisputed that the collateral consists of a motor vehicle acquired for the personal use of the Debtor. Thus, it must be determined to what extent GMAC has a purchase money security interest in order to discern whether the hanging paragraph will apply to GMAC's claim.

**A. Is negative equity included in the purchase money security interest amount?**

The first question presented in this case is whether the amount of the negative equity on a trade-in vehicle is a purchase money security interest ("PMSI") for purposes of the hanging paragraph of § 1325. Since the passage of BAPCPA, courts around the country have been forced to grapple with this issue. Courts have split on the issue of whether the amount of the negative equity should be considered a purchase money security interest for purposes of the hanging paragraph. Two divergent viewpoints have emerged on the issue. One view holds that negative equity is not included in the PMSI amount for purposes of the hanging paragraph.[8] The other

---

[7]In this case, the contract rate of interest is 0%.

[8]*See e.g., In re Sanders*, 377 B.R. 836, 858 (Bankr. W.D.Tex. 2007); *In re Johnson*, 380 B.R. 236, 241-47 (Bankr. D.Or. 2007); *In re Callicott*, 386 B.R. 232, 236 (Bankr. E.D.Mo. 2008); *In re Riach*, 2008 WL 474384, slip op. at *3 (Bankr. D.Or. 2008); *In re Look*, 383 B.R. 210, 219 (Bankr. D.Me. 2008); *In re Conyers*, 379 B.R. 576, 582 (Bankr. M.D.N.C. 2007); *In re Wear*, 2008 WL 217172, slip op. at *3 (Bankr. W.D.Wash. 2008).

view holds that negative equity is included in the PMSI amount for purposes of the hanging paragraph.[9] Courts continue to reach differing conclusions on the issue.[10] No consensus has as yet emerged. It is in the context of these disparate opinions that this Court must decide the issues presented.[11]

There is no definition of "purchase money security interest" in the Bankruptcy Code. Although not explicitly adopted in the Bankruptcy Code, courts generally look to state law to gain an understanding of the meaning of the term "purchase money security interest" as used in the hanging paragraph. *See e.g., In re Hayes*, 376 B.R. 655, 667-68 (Bankr. M.D.Tenn. 2007); *see also GMAC v. Peaslee*, 373 B.R. 252, 257 (W.D.N.Y. 2007); *see also In re Look*, 383 B.R. 210, 216-17 (Bankr. D.Me. 2008); *see also In re Schwalm*, 380 B.R. 630, 632 (Bankr. M.D.Fla. 2008). The *Hayes* Court, in justifying why the courts look to state law for the meaning of purchase money security interest, explained that: "[w]hile there is temptation to look for a federal definition of 'purchase money security interest,' prominent use of a term of art so closely identified with the Uniform Commercial Code and established state law counsels reference to state law." *In re Hayes*, 376 B.R. at 667-68. The *Hayes* Court then cites the pivotal decision in *Butner v. U.S.*, in that "[p]roperty interests are created and defined by state law. Unless some federal interest requires a different result . . . The justifications for application of state law are not limited to ownership interests; they apply with equal force to security interests[.]". *In re Hayes*, 376 B.R. at 668 (citing *Butner v. United States*, 440 U.S. 48, 55, 99 S.Ct. 914, 918, 59

---

[9]*See e.g., In re Petrocci*, 370 B.R. 489, 504-05 (Bankr. N.D.N.Y. 2007); *In re Brei*, 2007 WL 4104884, slip op. at *1 (Bankr. D. Ariz. 2007); *GMAC v. Peaslee*, 373 B.R. 252, 262 (W.D.N.Y. 2007); *In re Cohrs*, 373 B.R. 107, 109-10 (Bankr. E.D.Cal. 2007); *Graupner v. Nuvell Credit Corp*, 2007 WL 1858291, slip op. at *2 (M.D.Ga. 2007); *In re Schwalm*, 380 B.R. 630, 631 (Bankr. M.D. Fla. 2008).

[10]*See, e.g., In re Myers*, 2008 WL 2445214, slip op. at *2 (Bankr. S.D.Ind. 2008) (reaching the conclusion that negative equity is included in the PMSI) (decision issued June 13, 2008); *See also In re Hernandez*, 2008 WL 2338703, slip op. at *2 (Bankr. C.D.Ill. 2008) (reaching the conclusion that negative equity is not included in the PMSI) (decision issued June 9, 2008); *See also In re Munzberg*, 2008 WL 2332267, slip op. at *1 (Bankr. D.Vt. 2008) (reaching the conclusion that negative equity is not included in the PMSI, and adopting the dual status rule) (decision issued June 3, 2008).

[11]Some may find it relevant that, quantitatively, more courts follow the first viewpoint, and thus, they refer to this as the majority decision. However, there are many courts following each interpretation; I do not find a slight difference in the numbers of courts who follow each viewpoint to be relevant to a determination of which viewpoint is correct. There is presently no controlling law in the Third Circuit on this question.

-4-

L.Ed.2d 136 (1979)).

Pennsylvania law defined a purchase money security interest as part of its adoption of the Uniform Commercial Code, Article 9. Pennsylvania's Uniform Commercial Code ("UCC") defines purchase money security interest in relevant part as "[a] security interest in goods is a purchase-money security interest: (1) to the extent that the goods are purchase-money collateral with respect to that security interest." 13 Pa.C.S.A. § 9103(b). Purchase-money collateral is defined as: "[g]oods or software which secures a purchase-money obligation incurred with respect to that collateral." 13 Pa C.S.A § 9103(a). Purchase-money obligation is defined as: "[a]n obligation of an obligor incurred as all or part of the price of the collateral or for value given to enable the debtor to acquire rights in or the use of the collateral if the value is in fact so used." 13 Pa. C.S.A. § 9103(a). Comment 3 to § 9103 of the UCC ("Comment 3") further elaborates on the definition of purchase money security interest, purchase money collateral, and purchase money obligation. Comment 3 states that:

> Subsection (a) defines "purchase-money collateral" and "purchase-money obligation." These terms are essential to the description of what constitutes a purchase-money security interest under subsection (b). As used in subsection (a)(2), the definition of "purchase-money obligation," the "price" of collateral or the "value given to enable" includes obligations for expenses incurred in connection with acquiring rights in the collateral, sales taxes, duties, finance charges, interest, freight charges, costs of storage in transit, demurrage, administrative charges, expenses of collection and enforcement, attorney's fees, and other similar obligations.
>
> The concept of "purchase-money security interest" requires a close nexus between the acquisition of collateral and the secured obligation. Thus, a security interest does not qualify as a purchase-money security interest if a debtor acquires property on unsecured credit and subsequently creates the security interest to secure the purchase price. 13 Pa. C.S.A. § 9103, cmt. 3.

The comment is helpful but does not squarely answer the question of whether negative equity is included as part of the "price" of the collateral or the "value given to enable the debtor to acquire rights in or the use of the collateral. . .", such that it should be included in the PMSI amount. *See, e.g., In re Munzberg*, 2008 WL 2332267, 5 (Bankr. D.Vt. 2008) ("[These two terms] refer to the same non-exclusive list of eleven items as to what obligations may be secured by a PMSI.

-5-

The two terms are not differentiated or defined in their own right, but are conflated. Moreover, the list does not include *negative equity*, *gap insurance*, or a service contract-the items in dispute in the majority of bankruptcy cases addressing the scope of a PMSI under the hanging paragraph. Comment 3 also fails to specify what constitutes, or how to measure, a 'close nexus' between acquisition of the collateral and the secured obligation." (emphasis added)). However, in this Court's view, financing of negative equity is converting unsecured debt into secured debt. This approaches one of the situations addressed in Comment 3 which would not constitute purchase money, namely where the property is acquired on an unsecured basis, with the subsequent grant of a security interest. As such, this Court concludes that negative equity does not constitute part of a creditor's purchase money security interest.

## 1. In pari materia and other canons of statutory interpretation

The method of statutory interpretation employed by a court can have a substantial impact on which viewpoint a court will adopt with respect to the inclusion of negative equity in the PMSI amount.[12] "In pari materia" is a canon of statutory interpretation commonly relied upon, at least as a secondary justification, by those courts adopting the viewpoint that negative equity is included in the PMSI amount of a new vehicle purchase. *See, e.g., GMAC v. Peaslee*, 373 B.R. 252, 260 (W.D.N.Y. 2007); *See also In re Petrocci*, 370 B.R. 489, 501 (Bankr. N.D.N.Y. 2007). In pari materia means that similar statutes should be construed similarly. GMAC, the creditor in this case argues for such a use, contending that the UCC should be read in pari materia with the Federal Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 et seq., and the Pennsylvania Motor Vehicle Sales Financing Act ("MVSFA"), 69 Pa. C.S.A. § 601 et seq., to determine what items may be included in the creditor's purchase money security interest. The creditor posits that by doing so, all disputed items would be included in said creditor's purchase money security interest. Under this doctrine, "statutes addressing the same subject matter generally should be read 'as if they were one law'." *Lafferty v. St. Riel*, 495 F.3d 72, 81-82 (3rd Circ. 2007) (citing *Wachovia Bank v. Schmidt*, 546 U.S. 303, 305, 126 S.Ct. 941, 943-44, 163 L.Ed.2d 797 (2006));

---

[12] *See* Hon. Thomas F. Waldron & Neil M. Berman, Principled Principles of Statutory Interpretation: A Judicial Perspective After Two Years of BAPCPA, 81 Am. Bankr. L.J. 195, for a thorough discussion of the use of methods of statutory interpretation to unravel the often imperfect modifications to the Bankruptcy Code enacted by BAPCPA.

-6-

*See also* 1 Pa. C.S.A. § 1932.

Under certain circumstances, the MVSFA and the UCC have been read by Pennsylvania courts as being "in pari materia". *See Industrial Valley Bank and Trust Co. v. Nash*, 349 Pa.Super. 27, 44, 502 A.2d 1254, 1263 (1985) ("On the question of the kind of notice to be given to the debtor by the secured creditor, the MVSFA and the U.C.C. are clearly in pari materia since they relate to the identical thing-the sale of a repossessed motor vehicle."). This means of interpretation might seemingly extend to the meaning of purchase money security interest. *See In re Koresko*, 91 B.R. 689, 696 (Bankr. E.D.Pa. 1988) (". . . the MVSFA and UCC are to be construed in pari materia and hence as being consistent with each other *whenever possible*." (emphasis added)). However, even assuming the UCC and the MVSFA are to be read "in pari materia", this does not necessarily answer the question of whether negative equity should be included in the PMSI amount as GMAC contends. It is true that the MVSFA does include negative equity in its definition of "Principal amount financed". 69 P.S. § 603(13) ("Principal amount financed" is defined as "the unpaid cash price balance after deducting the down payment, adding the charges for any insurance required or obtained as security for or by reason of the sale of a motor vehicle under an installment sale contract, and adding other costs or charges necessary or incidental to the sale of the motor vehicle under an installment sale contract and amounts representing payment of a prior credit or lease balance to discharge a security interest, lien or lease interest on a motor vehicle or other property traded or returned."). However, the MVSFA does not include negative equity in the definition of "cash price". 69 P.S. § 603(11) ("Cash price" is defined as "the price measured in dollars at which the seller would in good faith sell to the buyer or to any other buyer under like circumstances, and the buyer would in good faith buy from the seller, the motor vehicle which is the subject matter of the installment sale contract, if such sale were a sale for cash instead of an installment sale."). The UCC, and specifically Comment 3 to § 9103, does not specify whether "principal amount financed" or "cash price", or neither, should be used to interpret the term "price" found in the UCC, and courts in other jurisdictions are at best divided on such a question.

-7-

Reading the MVSFA and the UCC in pari materia might count in favor of or count against including negative equity in the PMSI amount. Under the disclosure section of the MVSFA, the cash price of the motor vehicle must be specifically disclosed. 69 P.S. § 614(B)(1). This cash price can include:

> . . . any taxes, charges for delivery, charges for servicing, repairing or improving the motor vehicle, charges for service contracts and warranties which alternatively shall be disclosed pursuant to clause 5, charges for accessories and installation or other charges normally included in the delivered cash price of such motor vehicle. The cash price of the motor vehicle otherwise may not include charges required to be disclosed pursuant to clause 5. 69 P.S. § 614(B)(1).

Clause 5 of the disclosure section of the MVSFA requires the disclosure of:

> Other charges, necessary or incidental to the sale or financing of a motor vehicle, which the seller contracts to retain, receive or pay on behalf of the buyer and any other charges necessary or incidental to the sale or financing of the motor vehicle under the contract for which the seller agrees to extend credit to the buyer as authorized by this act, including charges for debt cancellation agreements and debt suspension agreements. 69 P.S. § 614(B)(5).

Comment 3 to § 9103 of the UCC states, in part, that:

> . . . the "price" of collateral or the "value given to enable" includes obligations for expenses incurred in connection with acquiring rights in the collateral, sales taxes, duties, finance charges, interest, freight charges, costs of storage in transit, demurrage, administrative charges, expenses of collection and enforcement, attorney's fees, and other similar obligations".

Thus, it is uncertain which, if either, of these disclosures sheds light on whether to include negative equity in the PMSI amount.

Certainly, the items that must be disclosed under "cash price" go beyond the mere sticker price of the car and include many of the categories of items that Comment 3 says should be included in the purchase money security amount, in which negative equity is noticeably absent. The items that must be disclosed under Clause 5 could arguably be interpreted as requiring the disclosure of negative equity, under the guise of a debt cancellation agreement. However, the items required to be disclosed in the cash price section seem a better fit with the types of items

-8-

listed in Comment 3. Cash price is not the mere "purchase price" of the vehicle, but also includes incidental charges for taxes, repairs and delivery charges, which mesh somewhat with the types of expenses enumerated in Comment 3. The situation can, at best, be said to be ambiguous.

Where the statute is, at best, ambiguous as to what term, if any, should be read in pari materia with the UCC's "price of the collateral" and "value given to the debtor to enable him to acquire rights in [the collateral]", it is prudent, and, in fact, required under Pennsylvania law, to look at the purpose behind the law, to determine if that purpose can shed light on how the MVSFA should be read with respect to the UCC. Pennsylvania's law of statutory construction supports such an inquiry. It is true that where "the words of a statute are clear and free of all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit." 1 Pa. C.S.A. § 1921(b); *See also Velocity Express v. Pennsylvania Human Relations Com'n*, 853 A.2d 1182, 1185 (Pa.Cmwlth. 2004) ("A statute is ambiguous or unclear where its language is subject to two or more reasonable interpretations."). Notwithstanding this caveat, under Pennsylvania law "[t]he object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly." 1 Pa..C.S.A. § 1921(a). Where a statute expressly declares its purpose, the task of determining legislative intent is made considerably easier as less precise means of making such a determination, such as relying on legislative history, are rendered unnecessary. The creditor in this case argues that the MVSFA and the TILA should all be read "in pari materia". As such, an examination of the purposes behind the TILA and the MVSFA can be illustrative as to how these statutes should be read in conjunction with the UCC.

**2. Federal Truth in Lending Act ("TILA") and the Motor Vehicle Sales Financing Act ("MVSFA")**

The purpose of the TILA is to protect consumers. *See* 15 U.S.C. § 1601(a). The act is intended to "assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices." *Id.* As has been noted by the Third Circuit regarding the purpose of TILA, "[t]he regulations reflect Congress' considered deliberation of the best way to ensure protection for and meaningful disclosure to consumers of credit terms and information. Moreover, the requirements

of the TILA exist to protect the consumer at the outset of the relationship, in order to even the often slanted credit and lending playing field." *Vallies v. Sky Bank*, 432 F.3d 493, 495 (3d Cir. 2006).

The MVSFA was likewise enacted to protect consumers. *See* 69 P.S. § 602; *See also Industrial Valley Bank and Trust Co. v. Nash*, 349 Pa.Super. 27, 41-44, 502 A.2d 1254, 1262-64 (Pa. Super. Ct. 1985). In the "Findings and declarations of policy" section of the MVSFA, the Pennsylvania legislature noted "nefarious, unscrupulous and improper practices in the financing of the sale of motor vehicles in this Commonwealth which are unjustifiably detrimental to the consumer and inimical to the public welfare." 69 P.S. § 602(a) (Purdon). The legislature goes on to state that ". . . [C]onsumers, because of. . . legal technicalities and because of their unequal bargaining position, are at the mercy of unscrupulous persons and are being intolerably exploited in the installment purchase of motor vehicles." 69 P.S. § 602(c). As such, the legislature determined that regulation of motor vehicle sales was necessary in order to provide "adequate protection of the public interest." 69 P.S. § 602(d). The legislature thus declared that the policy of the Commonwealth in enacting the MVSFA was ". . . [T]o promote the welfare of its [Pennsylvania's] inhabitants and to protect its citizens from abuses presently existing in the installment sale of motor vehicles." 69 P.S. § 602. In interpreting the MVSFA, courts have relied upon these "Findings and declarations of policy", noting that the "findings and declarations must be given weighty consideration when the Act is being interpreted." *Industrial Valley Bank and Trust Co. v. Nash*, 502 A.2d at 1262. Thus, it seems clear that the acts should be interpreted to further the goal of consumer protection, not as means to further the rights of creditors.

Ultimately, the TILA and the MVSFA do not explicitly say anything regarding what constitutes a PMSI. Rather, these two statutes, one federal and one state, are consumer protection statutes enacted to ensure that proper disclosures are made to consumers. Therefore, I find these statutes to be of little use in defining the borders of a PMSI. This Court looks principally to the UCC, as adopted in Pennsylvania, as the controlling law on the creation of security interests.

-10-

### 3. UCC interpretation

The Uniform Commercial Code, as revised and as adopted by the Pennsylvania legislature, is intended to be liberally construed and applied to promote its underlying purposes and policies, including the continued expansion of commercial practices through custom, usage, and agreement of the parties. 13 Pa. C.S.A. § 1102(a) and (b). However, the question remains of how broadly terms should be construed in regards to the Bankruptcy Code and the UCC. Recall that Comment 3 states that:

> . . . [T]he definition of "purchase-money obligation," the "price" of collateral or the "value given to enable" includes obligations for expenses incurred in connection with acquiring rights in the collateral, sales taxes, duties, finance charges, interest, freight charges, costs of storage in transit, demurrage, administrative charges, expenses of collection and enforcement, attorney's fees, and other similar obligations.
>
> The concept of "purchase-money security interest" requires a close nexus between the acquisition of collateral and the secured obligation. Thus, a security interest does not qualify as a purchase-money security interest if a Debtor acquires property on unsecured credit and subsequently creates the security interest to secure the purchase price. 13 Pa. C.S.A. § 9103 Comment 3.

Most of the items listed in Comment 3 are transaction costs directly related to the actual acquisition of property rights in the newly acquired collateral rather than the payoff of an "antecedent, undersecured loan" through the refinancing of " thousands of dollars of negative equity." *In re Padgett*, 2008 WL 2224880, 5 (Bankr. D.Kan. 2008); *See also In re Conyers*, 379 B.R. 576, 582 (Bankr. M.D.N.C. 2007) ("The examples given in Comment 3 are items that are directly associated with the purchase and retention of a new vehicle or other collateral. The court does not believe that payment of a pre-existing debt secured by other collateral is similar to those items. . ."). I cannot equate paying off negative equity to paying sales tax, freight charges, storage costs, or other similar charges. The payoff concerns a different vehicle and, usually, a different lender. Nothing in the UCC or its comments leads me to believe that the payment of an antecedent debt, such as negative equity, should be included as part of a creditor's purchase money security interest. As such, I hold that negative equity is not included in GMAC's PMSI for purposes of the hanging paragraph.

-11-

**B. Is gap insurance included in the purchase money security interest amount?**

 Gap insurance is insurance that covers the difference between what a vehicle with a lien is worth and the amount owed to the creditor holding that lien. As with negative equity, I do not find that gap insurance should be included in a creditor's purchase money security interest. Many other courts have reached this same conclusion. *See e.g., In re Hayes*, 376 B.R. 655, 672 (Bankr. M.D.Tenn. 2007) ("GAP insurance shifts a risk from the insured to an insurance company that is paid a premium to accept that risk. There is no evidence that the incidental benefit to GMAC of that shifting of risk enabled Tucker to buy a car."). As was noted by Judge Funk in *In re Honcoop*:

> Thus, the Court will address the extent to which a nonessential item, such as GAP insurance, may properly be construed as part of the purchase price. The Court finds that it is only proper to include those nonessential items that enhance or improve the value of the vehicle, such as window tinting or undercoating, in the purchase price. Clearly GAP insurance does not fit into this category, as the sole purpose of GAP insurance is to protect the owner of the vehicle in instances in which the portion of damage done to the vehicle is greater than its value. As the very nature of GAP insurance does not involve the overall enhancement of the vehicle, it cannot be properly construed as part of the purchase price nor does the Court find the requisite close nexus between the inclusion of GAP insurance and the acquisition of the vehicle. *In re Honcoop*, 377 B.R. 719, 723 (Bankr. M.D.Fla. 2007).

I find this reasoning to be persuasive, and consistent with my holdings regarding negative equity, administrative fees, licensing fees, and taxes. Similar to negative equity financing, gap insurance financing lacks the essential requirements for a PMSI. Gap insurance is not part of the "price" of the collateral, nor is it part of the value "given to enable the debtor to acquire rights in or the use of the collateral." As such, the financing that was paid toward Gap insurance will be excluded from GMAC's purchase money security interest.

-12-

**C. Are administrative fees, licensing fees, and taxes included in the purchase money security interest amount?**

Administrative fees, licensing fees, and taxes are included in the purchase money security interest amount of GMAC's loan. Comment 3 to the UCC explicitly includes administrative charges and sales taxes in the amount of a PMSI. This Court finds licensing fees to be precisely the type of "similar obligation" that is listed in Comment 3 as being part of a PMSI. As such, the portion of the loan made by GMAC to pay administrative fees, licensing fees, and sales taxes will be included in GMAC's purchase money security interest for purposes of the hanging paragraph.

**D. If negative equity and gap insurance are not included in GMAC's purchase money security interest, does that mean that the hanging paragraph will not prevent the bifurcation of the creditor's claim?**

When a claim is partly a purchase money security interest and partly a non-purchase money security interest, courts follow one of two different rules to determine what follows. A "transformation rule" converts the entire claim into a non-purchase money claim, eliminating any purchase money portion of the claim. *See Pristas v. Landaus of Plymouth Inc.*, 742 F.2d 797, 801 (3d Cir. 1984) (". . . because the item secures more than its own price, there is no longer a "pure" purchase-money security interest and consequently th[e] lien disappears."). On the other hand, the "dual status rule" allows the portion of the claim which is a purchase money security interest to remain so, even if part of the claim is non-purchase money. *See Pristas v. Landaus of Plymouth Inc.*, 742 F.2d 797, 801 (3d Cir. 1984)(". . . [A] purchase-money security interest in a quantity of goods can remain such "to the extent" it secures the price of that item, even though it may also secure the payment of other articles"). Thus, even if negative equity and gap insurance are not included in GMAC's purchase money security interest, the portion of the claim that is a PMSI will not be transformed into a non-purchase money interest if the dual status rule is applied.

The Third Circuit Court of Appeals adopted the dual status rule in *Pristas v. Landaus of Plymouth Inc.*, 742 F.2d 797, 801 (3d Cir. 1984). The decision concerned a consumer purchase of a washing machine. The Court focused on the language "to the extent" in the predecessor to UCC § 9103, UCC § 9-107. As in UCC § 9-107, UCC § 9103 utilizes "to the extent" language

-13-

in its definition of purchase money security interest. See 13 Pa. C.S.A. § 9103(b)(1) ("A security interest in goods is a purchase-money security interest: (1) *to the extent* that the goods are purchase-money collateral with respect to that security interest." (emphasis added)); *See also In re Schwartz*, 52 B.R. 314, 316-318 (Bankr. E.D.Pa. 1985) (supporting the reasoning of the court in *Pristas v. Landaus of Plymouth, Inc.*). The *Pristas* Court sought to preserve purchase money security interests from being extinguished by the mere presence of non-purchase money security interests, focusing on the "to the extent" language to preserve a purchase money security interest to the extent that "it is taken or retained by the seller of the collateral to secure all or part of its price." *Id.* at 800-01. The Third Circuit in *Pristas* also cites a Pennsylvania case, *Fedders Financial Corp. v. Chiarella Brothers* as an indication that Pennsylvania courts would also support a dual status rule. *Id.* at 801 (referring to *Fedders Financial Corporation v. Chiarelli Brothers*, 221 Pa.Super. 224, 289 A.2d 169 (1972)). As *Pristas* is still good law in the Third Circuit, we are bound to follow its precedent where its holding is applicable to the facts at issue. As such, it supports my conclusion that the dual status rule must be followed here.

**E. Does the hanging paragraph of § 1325 alter whether a "dual status" or "transformation" rule should apply?**

Knowing that a "dual status rule" applies under Third Circuit precedent and the Third Circuit's interpretation of Pennsylvania law does not quite end this analysis. Some courts have read the language of the hanging paragraph of § 1325 as requiring the application of what essentially is a transformation rule. *See In re Sanders*, 377 B.R. 836, 858 (Bankr. W.D. Tex. 2007); *See also In re Look*, 383 B.R. 210, 219-21 (Bankr. D.Me. 2008). These courts have determined that whether a state follows the transformation or dual status rule is the wrong question to ask. *See In re Sanders*, 377 B.R. 836, 858 (Bankr. W.D. Tex. 2007) ("Our task is to determine whether [the creditor] qualifies for the special protection afforded certain creditors under the 910-day provision of the Bankruptcy Code, a question of federal law. For that task, state law rules regarding the application of either the transformation rule or dual status rule are simply irrelevant."). These courts have held that while state law determines whether a purchase money security interest exists, one must look to federal law and § 1325 to determine the effect of that determination. *See, e.g., In re Sanders*, 377 B.R. 836, 858 (Bankr. W.D.Tex. 2007). These courts find that in interpreting the language of the hanging paragraph, the entire protection

-14-

against cramdown offered by the hanging paragraph is lost if any portion of the debt is not a purchase money security interest. *Id.* at 858-64. The courts place special emphasis on the use of "if" rather than "to the extent of" in the hanging paragraph, finding that the language of the hanging paragraph compels the application of what is in essence a transformation rule.

Other courts have criticized such an interpretation. The Court in *In re Johnson* explained why it disagreed with such a rule, beginning with the principle of statutory construction that "statutory language cannot be construed in a vacuum. It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *In re Johnson*, 380 B.R. 236, 250 (Bankr. D.Or. 2007). The *Johnson* Court further explained that:

> Congress did not state specifically that the [h]anging [p]aragraph applied to a claim or debt "or any part or portion" of either. Neither did Congress specify that the [h]anging [p]aragraph could be applied only to the "entire" claim or debt. In re Johnson, 380 B.R. 236, 250 (Bankr. D.Or. 2007).

The Court in *Johnson,* thus, did not find the "plain language" of the hanging paragraph to be dispositive as to whether a "dual status" or "transformation" rule would apply in this case. *Id.* Examining the language of the hanging paragraph and its legislative history, the Court found that the hanging paragraph was intended to combat a particular perceived abuse by debtors in chapter 13. *Id.* As such, given the clear purpose behind the hanging paragraph, the *Johnson* Court found that it was not sensible to apply a transformation rule and thus "deprive the creditor of the benefit under BAPCPA of its vehicle PMSI entirely because the creditor has financed some negative equity in its transaction with the Debtor." *Id.* The Court concluded that: "applying the dual purpose rule is more consistent with Congressional intent, as reflected in the hanging paragraph." *Id; See also In re Hayes*, 376 B.R. 655, 676 (Bankr. M.D.Tenn. 2007) ("The hanging sentence mixes state and federal legal principles in the complicated manner discussed above. Overlaying a federal transformation rule produces a wobbly three-legged stool anchored by no obvious [C]ongressional policy choice in this context.").

I am convinced the *Johnson* Court has adequately responded to arguments raised regarding the hanging paragraph compelling the application of a transformation rule. Thus, I hold that we are bound to follow the dual status rule as adopted in *Pristas*.

-15-

**Conclusion**

Based on the above, GMAC's objections to confirmation are sustained in part and overruled in part. The objections are sustained to the extent of the amount of the vehicle's loan, minus the negative equity and gap insurance financed amounts. The objections are overruled to the extent of the negative equity and gap insurance financed amounts. The Debtor is allowed thirty (30) days to file an amended plan consistent with this Opinion.

An Order will be entered consistent with this Opinion.

Date: July 15, 2008

Robert N. Opel, II, Bankruptcy Judge

(BI)

*This opinion is electronically signed and filed on the same date.*